# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

THIRD EDUCATION GROUP, INC.,

                Plaintiff,

      v.                                Case No. 07-C-1094

RICHARD PHELPS,

                Defendant.

---

RICHARD PHELPS,

                Plaintiff,

      v.                                Case No. 07-C-1095

THIRD EDUCATION GROUP, INC. and
BRUCE THOMPSON,

                Defendants.

---

## DECISION AND ORDER FOLLOWING COURT TRIAL

---

### I. PROCEDURAL HISTORY

On December 6, 2007, the defendant, Richard Phelps ("Phelps"), removed Milwaukee County Circuit Court case number 07-CV-13604 filed by Third Education Group, Inc. ("TEG, Inc."), from state court, and it was docketed as 07-C-1094 in this district. The matter was randomly assigned to this court. On the same day, Phelps filed in federal court his own lawsuit against TEG, Inc., and Bruce Thompson ("Thompson"), case number 07-C-1095, which was randomly assigned to the Honorable J.P. Stadtmueller.

The parties subsequently consented to the full jurisdiction of this court in case number 07-C-1094, and on August 6, 2008, this court denied the plaintiff's motion to remand 07-C-1094 to state court.

On September 5, 2008, Phelps filed in both cases a motion to consolidate cases 07-C-1094 and 07-C-1095 pursuant to Federal Rule of Civil Procedure 42(a) on the basis that each involves common questions of law and fact. Phelps indicated in his motion that it was unopposed; the deadline for the opposing party to respond passed and no response was filed. Therefore, on September 29, 2008, this court granted Phelps' motion for consolidation. All parties have consented to the full jurisdiction of a magistrate judge.

The parties' dispute focuses upon the ownership of the trademark "Third Education Group," and various other claims resulting from the break-up of the business relationship between Phelps and Thompson regarding a corporation they started together. Both parties filed motions for summary judgment and on May 15, 2009, this court entered an order resolving these motions. (Docket No. 99.) In this decision and order, the court's most significant conclusion was that Phelps' federal registration of the trademark was invalid because he did not own the trademark and had not used the trademark prior to the registration. (Docket No. 99.) Rather, the trademark, under common law, belonged to the parties' voluntary association and then TEG, Inc. as the successor entity. (Docket No. 99.) Phelps' complaint was thus dismissed in its entirety, but the court deferred entering judgment until the full resolution of these consolidated cases. On July 10, 2009, this court denied Phelps' motion for reconsideration. (Docket No. 113.) Because no claim survived the parties' motions for summary judgment for which any party requested a jury trial, a court trial was held on August 24, 2009.

At the scheduling conference held on May 28, 2009, the court instructed Thompson / TEG, Inc. to submit a statement of the claims they intended to present at trial. In this statement filed on

July 7, 2009, Thompson / TEG, Inc. identified three claims, all of which had survived summary judgment. (Docket No. 111.) In their pretrial report, Thompson / TEG, Inc. set forth the same three claims. Accordingly, Thompson / TEG, Inc. proceeded to trial on the following three claims: (1) breach of fiduciary duty, (as set forth in the second claim in TEG, Inc.'s complaint against Phelps, Docket No. 1-2 at 11); (2) unfair competition under the Lanham Act, 15 U.S.C. § 1125, (fourth counterclaim in Thompson / TEG, Inc.'s counterclaim against Phelps, Case No. 07cv1095, Docket No. 4 at 20); and (3) misrepresentation under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, (sixth counterclaim in Thompson / TEG, Inc.'s counterclaim against Phelps, Case No. 07cv1095, Docket No. 4 at 22).

## II. FINDINGS OF FACT

Phelps has a wide variety of experience in the field of education policy. In late 2000, Phelps encountered Thompson, a professor at the Milwaukee School of Engineering and a past president of the Milwaukee School Board, in an online educational policy chat room. In early 2002, after recognizing that they shared mutual interests and were concerned that current educational policy publications were generally devoted to the ideology of one of the two major political parties, Phelps and Thompson began discussing creating an online educational policy journal that would offer a different, middle perspective. Efforts were made, largely by Phelps, to first see if their idea for a journal could be affiliated with an existing entity, or to obtain sponsors or funding for their project. They were unsuccessful in their attempts to solicit outside support.

By the spring of 2004, Phelps and Thompson agreed upon a name for their journal, "Third Education Group." Phelps proceeded to register the domain names "thirdeducationgroup.net" and "thirdeducationgroup.org," which were intended to be the home for the online journal. On June 6, 2004, Phelps submitted a trademark application for "Third Education Group," identifying a first use date of December 30, 2004 and a first use in commerce date of January 1, 2005. The trademark

application identified only Phelps. The trademark was registered on August 15, 2006 (SN 78-430,624).

Phelps and Thompson moved forward with their voluntary association and established an understanding concerning journal editorial policy. Regarding their business relationship, they acknowledged that it would be preferable to acquire tax exempt status by creating a § 501(c)(3) corporation. Therefore, in early 2005, Third Education Group incorporated in Wisconsin, becoming Third Education Group, Inc. Wisconsin law requires that a corporation have three directors, so Phelps, Thompson, and Thompson's wife became the directors of the corporation. About a year later, a significant dispute arose between Thompson and Phelps regarding the suitability of a particular article for publication in the online journal. This dispute eventually resulted in the severing of the relationship. Phelps resigned from the editorial board of the journal and changed the passwords necessary to be able to make changes to the corporation's websites. In response, on March 14, 2006, a meeting of the board of the directors of the corporation was called and was attended by Thompson and his wife. At this meeting, Phelps was removed as president of the corporation. At a subsequent meeting, which Phelps again did not attend, on May 6, 2006, Thompson and his wife voted to remove Phelps as a director of the corporation.

After his split with Thompson, Phelps utilized the corporation's domain names as the home for his own independent organization, which he incorporated in Iowa, also using the name "Third Education Group, Inc." After being locked out of its own websites, the Wisconsin corporation copied much of its website content from the sites now controlled by Phelps, and reposted it under the domain name tegr.org. In response, Phelps, through counsel, sent various notices alleging copyright infringement under the Digital Millennium Copyright Act ("DMCA") to internet service providers hosting the tegr.org website, thus resulting in these providers blocking access to the tegr.org website.

4

More facts will be discussed as they necessarily relate to an analysis of the issues.

## III. CONCLUSIONS OF LAW

### A. Unfair Competition under the Lanham Act

As a preliminary matter, the court is faced with the renewed question of whether TEG, Inc. owns any right to the trademark that may be enforced under the Lanham Act. Although this court has previously been presented with lengthy opposing motions for summary judgment and a motion for reconsideration filed by Phelps, now in his post-hearing brief, Phelps raises for the first time his contention that the trademark remains property of TEG, the unincorporated association, and it never passed to TEG, Inc. Only if TEG, Inc. has a right to the trademark does TEG, Inc. have a viable claim under the Lanham Act.

The court previously stated that "the trademark is the property of TEG, Inc. as the successor to TEG." (Docket No. 99 at 11-12.) Because the legal basis for this succession has now been challenged, the court finds it prudent to further explain its conclusion. In so doing, the court will not discuss whether Phelps has waived this argument by not raising it sooner.

This case comes before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, and thus this court is required to apply state substantive law. Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087, 1090 (7th Cir. 1999). Neither party raises a conflict of law issue, but both do cite Wisconsin case law and statutes, seemingly agreeing that Wisconsin law applies. Thus, Wisconsin law applies in the present case. Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, 136 F.3d 1116, 1120 (7th Cir. 1998) (quoting Wood v. Mid-Valley, Inc., 942 F.2d 425, 426-27 (7th Cir. 1991)) ("the operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits. . . . Courts do not worry about conflict of laws unless the parties disagree on which state's law applies."); see also Grundstad v. Ritt, 166 F.3d 867, 870 (7th Cir. 1999) (same). Therefore, this court must attempt to

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 5 of 28   Document 138

predict how the Wisconsin Supreme Court would decide the issues presented here. <u>Lexington Ins. Co.</u>, 165 F.3d at 1090 (citing <u>Allen v. TransAmerica Ins. Co.</u>, 128 F.3d 462, 466 (7th Cir. 1997)). "Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." <u>Id.</u> "In the absence of Wisconsin authority, [a federal court] may consider decisions from other jurisdictions." <u>Id.</u> (citing <u>Valerio v. Home Ins. Co.</u>, 80 F.3d 226, 228 (7th Cir. 1996)).

In support of each of their respective positions, the parties both cite 8 William Meade Fletcher, <u>Fletcher Cyclopedia of the Law of Private Corporations</u>. (<u>See</u> Docket Nos. 132 at 5-6; 134 at 4.) It is not surprising that both parties cite <u>Fletcher</u> because it is a recognized treatise in this area. Unfortunately, as with most treatises, it contains passages that support the contradictory positions of the parties.

Phelps quotes from § 4005 which notes that ordinarily, the property of a members of an association does not pass to the corporation upon the association incorporating. "Some action is necessary on the part of the partners in divesting themselves of title and on the part of the corporation in receiving title." (Docket No. 132 at 5-6 (quoting <u>Fletcher</u>, § 4005).) TEG, Inc. quotes § 4003, which states, "the formation of a corporation by members of a voluntary association operates to dissolve the society and substitute the corporate entity in its place." (Docket No. 134 at 4 (quoting <u>Fletcher</u>, § 4003).)

But <u>Fletcher</u> offers more than these two relevant passages. The treatise notes that a corporation is an entity distinct from a partnership. <u>Fletcher</u>, § 4003. Even though it might continue the business of the partnership, have the same membership, and identical names, "the rights and liabilities of the one are not the rights and liabilities of the other." <u>Id.</u> The section continues and states that although it is possible for an association to survive incorporation, whether an association continues to exist following incorporation in a particular case must depend upon the unique

circumstances, including, for example, the purpose for which the corporation was created, the authority of the association members who acted to create the corporation, and many others. Id. Section 4004 seems directly on point when it states: "The incorporation of a voluntary association, if the act of the association and not the unauthorized step of some of its members, merges the association in the corporation, and its property becomes the property of the corporation." Fletcher, § 4004.

The parties also both refer to Spiritual & Philosophical Temple v. Vincent, 127 Wis. 93, 105 N.W. 1026 (1906), a case in which the Wisconsin Supreme Court held that the property of a religious organization automatically passed to the corporate entity upon incorporation. However, Vincent is distinguishable because in that case the entity was incorporated pursuant to a statute that explicitly stated that the assets of the unincorporated entity would pass to the corporation; that is not the case here. The court has not identified any Wisconsin statute addressing the question presently before this court.

The precise issue presented here—what becomes of the property of an unincorporated association when that association incorporates—has not been directly answered by any Wisconsin court. The issue was presented to the Wisconsin Supreme Court in 1956 but the court resolved that case on procedural grounds without addressing the underlying issue. Minocqua Resort Asso. v. Stack, 271 Wis. 472, 271 Wis. 472 (1956). After the briefing in this matter was closed, Phelps submitted a letter directing the court to Jolin v. Oster, 44 Wis. 2d 623, 172 N.W.2d 12 (1969), a case addressing the question of whether a joint venture survives incorporation. The court stated:

> [A]lthough the early cases adopted the view that incorporation spelled the end of the joint venture, the later cases consistently have taken the view that where the intention of the parties is clearly expressed to use a corporation as a means of conducting the joint-venture business, the courts will give effect to their expressed intention, so long as the rights of innocent third persons are not prejudiced. We think this is the better rule and we adopt it.

Id. at 633, 172 N.W.2d at 17.

As the portions of Fletcher quoted above make clear, the courts around the country that have addressed this question have reached differing conclusions. Upon this court's review of the case law on the subject, it appears that these divergent results are primarily the result of the many varieties of circumstances in which the issue may arise.

Some states have statutes that directly address the question presented and thus some courts are able to resolve the question on that basis. In other cases, results may differ depending upon the factual circumstances that led to the incorporation of the association. For example, courts may differ in their resolution of this question if the association incorporated with the unanimous approval of the association or if the effort to incorporate was the product of one faction of an association. If it was the result of the actions of a faction, results may differ depending upon whether the faction constituted a majority or minority of the association and the unique facts leading to the incorporation. Further, courts may reach different conclusions based upon the type of property involved; courts may find that specific statutory or common law provisions relating to the conveyance of real property to be controlling.

As the above-quoted statement from Jolin suggests, in Wisconsin, determining what happened to a joint venture or voluntary association upon incorporation will depend upon the unique circumstances of each case and whether the parties "clearly expressed" the intention for the association to survive incorporation. In the present case, TEG, the association, incorporated as a result of the unanimous consent of its members. The evidence demonstrates that Phelps and Thompson intended TEG, Inc. to succeed the unincorporated association; there is absolutely no evidence to permit the court to conclude that Phelps and Thompson intended the unincorporated association to coexist alongside the corporation and to retain control of the trademark or any other property. The evidence demonstrates that in every way, the parties intended TEG, Inc. to be the

8

successor to the unincorporated association. There no longer was an unincorporated association once TEG, Inc. was created.

Therefore, the property of the association passed to the corporation, and the absence of an assignment does not affect TEG, Inc.'s right to the trademark. The court finds this conclusion has ample support in the analogous case law. See, e.g., First Russian Nat'l Organization, Inc. v. Zuraw, 89 Conn. 616, 619, 94 A. 976, 977 (1915) ("Where a voluntary association becomes incorporated under a special charter or general laws, it becomes merged in the corporation, its members become the constituent members of the corporation, and its property becomes the property of the corporation."); Wiltowski v. Wojciechowski, 84 N.H. 262, 265 149 A. 506, 508 (N.H. 1930) ("If [the corporation's] formation and succession to the society in active accomplishment did not carry with it and effect a transfer of title as a circumstantial manifestation of intention so to do, the corporation at least acquired the equitable title to the property."); Maron v. Howard, 258 Cal. App. 2d 473, 485 (Cal. App. 1968) ("The corporation may, however, acquire an equitable title without a conveyance."); see also Jolin, 44 Wis. 2d at 633, 172 N.W.2d at 17 (holding that a joint venture survives incorporation "where the intention of the parties is clearly expressed to use a corporation as a means of conducting the joint-venture business.").

Turning to the merits of TEG, Inc.'s Lanham Act claim, the initial question to be answered is whether the trademark is entitled to protection. In relevant part, 15 U.S.C. § 1125(a) states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 9 of 28   Document 138

In order to determine whether a mark is entitled to protection, it is necessary to determine the nature of the mark. Marks are classified as either (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. Two Pesos v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). These categories are presented in order of increasing distinctiveness with generic marks never being subject to protection whereas suggestive, arbitrary, and fanciful marks are inherently distinctive and thus entitled to protection. Id. In the middle of the spectrum lie descriptive marks.

> Normally, descriptive marks are not protected because they are a "poor means of distinguishing one source of services from another." Platinum Home Mortgage Corp., 149 F.3d at 727 (internal citations and quotations omitted). Descriptive marks are protected only if they have acquired distinctiveness, or "secondary meaning," in their relevant market. Blau Plumbing v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986) ("Holiday Inn" is descriptive term that has acquired secondary meaning). Secondary meaning exists when consumers think of the term not as a description but as the name of the product or service itself. [I]d.; see also Mil-Mar Shoe Co., Inc., 75 F.2d at 1156-57. The distinctiveness of a mark "cannot be determined in the abstract, but only by reference to the goods or services upon which the mark is used." J. Thomas McCarthy, McCarthy on Trademarks § 11: 64.

Mid-West Mgmt., Inc. v. Capstar Radio Operating Co., 2004 U.S. Dist. LEXIS 22775, 10-12 (W.D. Wis. 2004).

The mark "Third Education Group" is either descriptive or suggestive. If it is descriptive, TEG, Inc.'s claim will not succeed because it has failed to introduce any evidence that the mark has acquired secondary meaning in the relevant market. Thus, naturally, TEG, Inc. contends that the mark is suggestive. (Docket No. 130 at 8.)

The court concludes that the mark is suggestive. If the name was merely "Education Group," almost certainly the mark would be merely descriptive. But with the addition of "Third," the mark becomes suggestive. It requires the imagination of the viewer to discern what "Third Education Group," is and what it does.

The court need not belabour the point because Phelps does not challenge TEG, Inc.'s assertion that the mark is suggestive. In fact, Phelps does not address the merits of TEG, Inc.'s

infringement claim at all. Phelps' defense on this claim focuses entirely upon the argument that Thompson and Phelps remain joint holders of the mark as members of the unincorporated association because the mark was never assigned to TEG, Inc. For the reasons discussed above, the court rejects this contention.

As for the proof of likelihood of confusion, the court finds that TEG, Inc. has sustained its burden in proving this element of its claim. TEG, Inc. and Phelps both operated in the same market, presented themselves to the public in the same manner, created the same products, and used the exact same name. Under such factual circumstances, the likelihood of confusion is self-evident and thus it is no surprise that Phelps offers no substantive defense to this claim. Therefore, the court concludes that Phelps' conduct violated the Lanham Act. The question of damages will be discussed below.

### B. Breach of Fiduciary Duty

Under Wisconsin law, the Wisconsin Supreme Court has observed,

In any analysis of a claimed breach of fiduciary duty, there are two central questions to address: was the relationship a fiduciary relationship, and if so, what is the nature of the fiduciary duty that is at issue?

The expression, fiduciary duty, relates to those obligations that are peculiar to a fiduciary and are based on the conscious undertaking of a special position with regard to another. A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own.

This constraint on acting in one's own self-interest has been described as a fiduciary's duty of loyalty. However, the duty of loyalty is broader than simply requiring the fiduciary to refrain from acting in his own self-interest. . . . Webster defines loyalty as "tenacious adherence" to principle and an obligation "based on individual choice." Webster's Third New International Dictionary 1342 (14th ed. 1961).

A breach of the duty of loyalty imports something different from mere incompetence; it connotes disloyalty or infidelity. At its core, a fiduciary's duty of loyalty involves a state of mind, so that a claimed breach of that duty goes beyond simple negligence. For example, a lawyer can breach his fiduciary duty of loyalty to a client by entering into a contract with a client without full disclosure that the

11

contract will benefit the lawyer and potentially disadvantage the client. However, simple carelessness in drafting a will so that it does not achieve the tax savings that the client requested is negligence. Neither duty is of lesser importance; they are just different obligations. Said otherwise, not every legal claim arising out of a relationship with fiduciary incidents will give rise to a claim for breach of fiduciary duty.

Zastrow v. Journal Communs., Inc., 2006 WI 72, ¶¶27-30, 291 Wis. 2d 426, 718 N.W.2d 51

(2006) (internal citations, footnote, and quotation marks omitted).

"While corporations are statutory creatures, the basic relationship between a corporation and its directors and officers has been established by common law. [Wisconsin] has long recognized that directors and officers can be held liable for a breach of their fiduciary duty to the corporation and its shareholders." Benjamin Plumbing, Inc. v. Barnes, 162 Wis. 2d 837, 857-58, 470 N.W.2d 888, 897 (1991). An example of a breach of a corporate officer's breach of fiduciary duty is the use of the corporate assets for his personal benefit. See Racine v. Weisflog, 165 Wis. 2d 184, 190, 477 N.W.2d 326, 330 (Ct. App. 1991). "[T]he assets of a corporation belong to that corporation." Krier v. Vilione, 2009 WI 45, ¶34, 766 N.W.2d 517 (2009).

TEG, Inc. alleged in its complaint that Phelps breached his fiduciary duty to the corporation by, first, registering the trademark and the domain names in his personal name and, second, by asserting personal ownership and control over these corporate assets. (Second claim in TEG, Inc.'s complaint against Phelps, Docket No. 1-2 at 11). In its pretrial report, TEG, Inc. makes no mention of the first variety of its breach of fiduciary duty claim. But in addition to its claim that Phelps breached his fiduciary by blocking access to the TEG, Inc. websites, TEG, Inc.'s pretrial report mentions a variety of claims not raised in its complaint such as Phelps' alleged actions regarding engaging in direct competition with TEG, Inc., disregarding the corporate bylaws, and failing to attend a corporate meeting. (Docket No. 121 at 33-36.)

Only claims raised in the complaint are properly before this court, and thus the court shall not consider the various claims TEG, Inc. raised for the first time in its pretrial report. Further, by

12

not raising in its pretrial report its claim that Phelps breached a fiduciary duty by registering the trademark and domain names in his own name, this claim is deemed abandoned and shall not be considered further by the court. Thus, the only claim before this court, in that it was raised in the complaint and not abandoned by its omission from the final pretrial report, is a claim for breach of fiduciary duty regarding Phelps blocking TEG, Inc. from accessing the domain names. Accordingly, the only question before the court is whether Phelps breached a fiduciary duty by blocking TEG, Inc.'s access to the websites "no later than March 13, 2006," (Docket No. 130 at 2).

The undisputed evidence demonstrates that the domain names thirdeducationgroup.org and thirdeducationgroup.net were registered for TEG and were not simply Phelps' personal website. (See, e.g., Docket No. 73-2 at 178, Email from Phelps to Thompson dated July 29, 2005 ("I'm thinking of moving my personal web site onto *our* organization web site, to save myself a few hundred bucks, if I can figure out a how to do it.".) (emphasis added). Even the application for the trademark in describing the specimen provided identified the TEG website as that of the organization and not merely Phelps' personal property. (Docket No. 73-2 at 196 "This is the masthead for the Web pages at *our* Web site, www.thirdeducationgroup.org.") (emphasis added).

Although registered in Phelps' name, at the time he registered these domain names, the evidence clearly established that he was doing so on behalf of TEG. As such, the domain names belonged to TEG. Therefore, just as this court previously determined regarding the trademark, because TEG was an unincorporated association, each member of the association, i.e. Thompson and Phelps, had a joint interest in these domain names. TEG, Inc. was the successor to the unincorporated association and thus control of the domain names passed to TEG, Inc. When Phelps split with TEG, Inc., he had no authority to continue to maintain the domain names or to use the domain names for his personal benefit.

Phelps contends that TEG, Inc.'s claim must fail because Phelps was removed from the corporation on March 14, 2006. (Docket No. 132 at 8.) According to Phelps, having been removed from his position in the corporation, when he blocked access to the websites two days later, he no longer owed any fiduciary duty to the corporation. TEG, Inc. replies that the March 14, 2006 resolution removed Phelps only as president of the corporation but he remained a director, and thus owed fiduciary duties to the corporation, until a second resolution on May 6, 2006. (Docket No. 134 at 6-7.) Also in reply, TEG, Inc. alleges that Phelps had blocked access to the websites prior to his March 14, 2006 removal.

Exhibit 28 demonstrates that access to thirdeducationgroup.org was blocked to Thompson as of March 12, 2006; whether the lockout occurred some time before this date is unclear. But the precise date is irrelevant to present purposes. Likewise, it is not necessary for the court to discern whether the March 14, 2006 resolution removed Phelps only as president or also as a director. The evidence demonstrates that by at least March 12, 2006, two days before the resolution and thus a time when it is undisputed that Phelps was both a director and president of TEG, Inc., he blocked Thompson (and anyone else associated with the corporation) from making changes to the corporation's website.

A corporate officer taking an asset of the corporation and using it for his own purposes is perhaps the epitome of a breach of a fiduciary duty. TEG, Inc. was a corporation that interacted with the public primarily through its website. The website was essentially its storefront. By taking control of the domain names and precluding members of the corporation from accessing it was akin to a corporate officer changing the locks and barring the doors to the corporate offices. And by then continuing to use the domain names for his personal benefit, it would be as if the former corporate officer squatted in the corporate office and then used those corporate offices as the home for his own new business. Thus, it is the conclusion of this court that Phelps breached a fiduciary duty

owed to TEG, Inc. by asserting and retaining personal control over the corporation's domain names.

Again, the court shall address the question of damages below.

### C. Digital Millennium Copyright Act

Turning to the next claim of misrepresentation by Phelps, the following presents an

overview of the Digital Millennium Copyright Act ("DMCA").

Title II of the DMCA contains a number of measures designed to enlist the cooperation of Internet and other online service providers to combat ongoing copyright infringement. See 17 U.S.C. § 512. "Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Rep. 105-551, pt. 2, at 49 (1998). Title II also was intended to "balance the need for rapid response to potential infringement with the end-users [sic] legitimate interests in not having material removed without recourse." Sen. Rep. No. 105-190 at 21 (1998). When a copyright owner suspects his copyright is being infringed, he or she must follow the notice and takedown provisions set forth in § 512(c)(3) of the DMCA, which provide in part:

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

17 U.S.C. § 512(c).

15

<u>Rossi v. Motion Picture Ass'n of Am., Inc.</u>, 391 F.3d 1000, 1003 (9th Cir. 2004).

In response to this claim, Phelps broadly states that he made no knowing misrepresentation to the effect that Thompson was infringing on the mark and that he (Phelps) acted on the advice of counsel. The basic thrust of Phelps' defense to the DMCA claim of misrepresentation is that he was acting in good faith. The good faith belief incorporated into § 512(c)(3)(A)(v) is one of subjective good faith. <u>Id.</u> at 1004-05. Thus, a party is not liable under § 512(c)(3) of the DMCA because of an unknowing mistake, even if that mistake was objectively unreasonable. <u>Id.</u> at 1005. Rather, there must be a demonstration that the actor had some actual knowledge of the misrepresentation. <u>Id.</u>

Thompson / TEG, Inc. have failed to demonstrate that Phelps lacked a good faith belief that he owned the copyright to the website material and that Thompson / TEG, Inc. were not authorized to use it. Determining ownership of the website material required resolution of complex and somewhat novel legal questions regarding Wisconsin's common law relating to unincorporated associations and how the intellectual property of a voluntary association is affected when the association subsequently incorporates. Phelps was largely responsible for coming up with the idea of an independent educational policy journal, he came up with the name for the organization, he registered the trademark, he registered the domain names, and he did or paid for nearly all the work on the website. Finally, the allegedly infringing content was an article that he wrote. There is absolutely no evidence to suggest that Phelps acted without subjective good faith when he brought his claim under the DMCA. Therefore, as to the claim of misrepresentation, it shall be dismissed and judgment shall be entered to that affect in favor of Phelps.

### D. Damages

#### i. Damages for Unfair Competition

A party that demonstrates a violation of 15 U.S.C. § 1125(a) shall be entitled to recover for any damages sustained, profits lost, and the costs of the action. 15 U.S.C. § 1117(a). Depending

upon the circumstances, a court may order a plaintiff to recover up to three times its actual damages. Id. "The court in exceptional cases may award reasonable attorney fees to the prevailing party." Id.

TEG, Inc. contends that as a result of Phelps' infringement, it suffered actual damages "in the value of time and resources invested in developing the mark." (Docket No. 130 at 27.) Specifically, TEG, Inc. points to the lost value of the time that Phelps donated to TEG and TEG, Inc. in developing the mark and the $435.00 that Phelps expended to register the mark.

There are a variety of ways to calculate damages in a trademark infringement case. The method TEG, Inc. urges the court to adopt is one in which it is compensated for all the time and effort Phelps expended in an effort to develop the mark. The court finds that TEG, Inc. is not entitled to any monetary award because TEG, Inc. has completely failed to prove that it suffered any damages as a result of Phelps' infringement. See, e.g., Caesars World, Inc. v. Venus Lounge, Inc., 520 F.2d 269, 275 (3d Cir. 1975).

In regards to TEG, Inc.'s contention that it should recover for lost expenditures, i.e. the time and money that Phelps invested in developing the mark on behalf of TEG, Inc., this argument fails for a number of reasons, not the least of which is the fact that TEG, Inc. has failed to demonstrate the monetary value of Phelps' contributions. TEG, Inc. appears to request that the court simply guess as to the amount of time Phelps put into developing the mark and then to assign a value to that time. But damages are not determined through speculation; it is the burden of the party seeking damages to prove the amount of those damages.

As for the registration fee, which is the only solid dollar figure TEG, Inc. presents, in no way did Phelps' infringement result in a loss of the $435.00 registration fee. It was not Phelps' infringement that resulted in the registration being invalid. Absent Phelps' infringement, this litigation might not have resulted and thus TEG, Inc. might not have learned of the invalidity, but the registration would have been invalid all the same.

As regards damages based upon the value of the mark, this also requires the court to engage in speculation. TEG, Inc. has failed to establish any entitlement to recovery under this theory. TEG, Inc. acknowledges that the "mark had limited financial value." (Docket No. 134 at 12.) But even here, simply claiming value, even limited, is not the same as establishing value. TEG, Inc. has simply failed to prove that Phelps' efforts on behalf of TEG, Inc. created value in the trademark. A person may invest countless hours and even millions of dollars in an effort to create a valuable mark, but if those efforts are unsuccessful, the mark may remain without value. On the other hand, even if a mark had some value, simply because it is infringed upon does not mean that the infringement wipes out all the value of the mark. It is simply illogical to assume the proper way of calculating damages in a trademark infringement case is to have the infringer pay for all the time and expense the mark holder invested in establishing the mark. TEG, Inc. has failed to demonstrate, for example, that Phelps' infringement resulted in a loss of goodwill or in a loss of income that it otherwise would have received.

Finally, and not surprisingly, TEG, Inc. contends that this is an "exceptional" case that warrants an award of attorneys' fees. "Congress intended that broad principles of equity should guide the award of fees under the statute. Specifically, the Senate report states that the purpose of the fee-shifting provision is to 'authorize award of attorney fees to the prevailing party in trademark litigation where justified by equitable considerations.'" Te-Ta-Ma Truth Foundation-Family of URI v. World Church of the Creator, 392 F.3d 248, 260 (7th Cir. 2004) (quoting S. Rep. No. 93-1400 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7132). "Cases that award attorneys' fees under 15 U.S.C. § 1117(a) involve truly egregious, purposeful infringement, or other purposeful wrongdoing. Badger Meter v. Grinnell Corp., 13 F.3d 1145, 1159 (7th Cir. 1994). In an effort to describe an "exceptional" case, courts have frequently resorted to describing "exceptional" as

18

"malicious, fraudulent, deliberate, or willful." <u>See</u>, <u>e.g.</u>, <u>Door Systems, Inc. v. Pro-Line Systems, Inc.</u>, 126 F.3d 1028, 1031 (7th Cir.1997) (citing cases).

It is the conclusion of the court that none of the foregoing descriptive words for "exceptional" fit the facts of this case, save one. There is no doubt that Phelps' infringement was "deliberate" in the sense that he continued to use the mark with full knowledge of TEG, Inc.'s claim to it. However, a deliberate act, by itself, is not enough to rise to the level of an exceptional case. <u>Id.</u> Something more is needed, but it is not "bad faith." "Deliberate" is not equivalent to "in bad faith." <u>Id.</u> (citing <u>BASF Corp. v. Old World Trading Co.</u>, 41 F.3d 1081, 1099 (7th Cir. 1994). "One firm might copy another's trademark believing in good faith that it was privileged to do so; it would be acting deliberately, and so could be ordered, in the discretion of the district court, to pay the other party's attorneys' fees, but it would not be acting in bad faith." <u>Id.</u> In other words, depending on the circumstances, an action might be deliberate without necessarily rendering the case exceptional.

Recognizing that a deliberate act is not necessarily taken in bad faith, in this case, the court finds that the actions of Phelps were not taken in bad faith. To the contrary, Phelps had much more than a mere good faith belief that he was entitled to use the mark. This was not a case of an individual, for example, mistakenly believing he had a license. Rather, in the present case, the objective evidence was on Phelps' side. He was the one who undisputedly came up with the mark. He was the one who paid to register the mark. He was the one in whose name the mark was registered. And he was the one primarily responsible for establishing the use of the mark. He did this, not as one person in a large organization, but rather as an individual who had joined with another collaborator and in doing so, likely without an understanding of the legal ramifications, formed an unincorporated association. As the person who invested so much in creating the mark, it is not surprising that Phelps felt passionately about the mark and the organization he was primarily responsible for creating, as is reflected in some of his correspondence with Thompson. But the fact

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 19 of 28   Document 138

that he spoke passionately in defense of what he believed to be his mark does not make this case exceptional.

It was only as a consequence of the interplay of Wisconsin's common law regarding unincorporated associations, federal laws and regulations relating to the registration of trademarks, and Wisconsin law regarding what happens to the intellectual property of an unincorporated association after it is incorporated, that Phelps was found to not control the mark.

This case can only be considered exceptional in the novelty and complexity of the legal questions the court was required to resolve. Despite what might appear as an objectively reasonable belief by Phelps, legally it was the corporation, and not the individual, that actually controlled the trademark. Phelps had not only a "good faith" belief that he owned the mark but perhaps what might be described as a "great faith" belief. This was not a case of truly egregious, purposeful infringement, or other purposeful wrongdoing. See Badger Meter, 13 F.3d at 1159.

The court finds that this case is not exceptional and declines to exercise its discretion to award attorney's fees to TEG, Inc. The court concludes that requiring Phelps to pay TEG, Inc.'s attorney's fees would be inconsistent with broad principles of equity.

### ii. Damages for Breach of Fiduciary Duty

TEG, Inc. contends Phelps' breach of his fiduciary duty resulted in the loss of the value of the software, website design, and domain names (in the amount of approximately $865.00) and the loss of the value of Phelps' invested time, estimated at more than $75,000. (Docket No. 130 at 29.) In an effort to support its damages, TEG, Inc. points to Exhibit 11, a spreadsheet outlining TEG, Inc's expenses, and this court's order denying TEG, Inc.'s motion for remand, concluding that Phelps demonstrated that the amount in controversy exceeded $75,000.00 so as to provide this court with jurisdiction over the claim, (Docket No. 34 at 6). TEG, Inc. also seeks punitive damages.

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 20 of 28   Document 138

As for the value of the time Phelps donated to TEG, Inc., as discussed earlier, TEG, Inc. has failed to sustain its burden of proof regarding the amount of time Phelps donated, the value of that time, and that Phelps' breach of his fiduciary duty undid any, much less all, of Phelps' investment.

TEG Inc.'s attempt to bootstrap the court's statement in its order denying remand to establish damages at trial cannot be sustained. The fact that the court concluded, based on allegations contained in the initial pleadings, that Phelps demonstrated that the requisite amount was in controversy to sustain the court's exercise of jurisdiction does not equate with a determination that TEG, Inc. established damages in that amount at trial. The party seeking damages retains the burden to prove those damages and in this regard, TEG, Inc. has failed.

When Phelps locked TEG, Inc. out of its website, he did not destroy the website. TEG, Inc. was not required to re-do all of Phelps' efforts to re-create the website. The evidence makes clear that TEG, Inc. was able to copy the website and re-publish it under a different domain name. Further, many of the expenses that are listed on Exhibit 11 are hosting expenses, which are annual subscription expenses that were incurred regardless of Phelps' breach of his fiduciary duty. At most, Phelps' breach of fiduciary duty likely resulted in TEG, Inc. incurring the additional expense of obtaining the new domain name, tegr.org. But TEG, Inc. failed to introduce evidence as to the nature of such expenses. Accordingly, TEG, Inc. has failed to establish that it suffered any damages as a result of Phelps' breach of fiduciary duty.

As for punitive damages, TEG, Inc. contends that Phelps should pay punitive damages "at least equal to his own attorney fees." (Docket No. 130 at 30.) "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043.

> In order to meet the requirements of Wis. Stat. § 895.043(3), the plaintiff's evidence must show that the defendant acted "with a purpose to disregard the plaintiff's rights, or [was] aware that his or her acts [were] substantially certain to result in the plaintiff's rights being disregarded." Strenke v. Hogner, 2005 WI 25, P38, 279 Wis.

21

> 2d 52, 694 N.W.2d 296. Such a showing requires that the defendant's "act or course of conduct [was] deliberate," that "the act or conduct . . . actually disregard[ed] the rights of the plaintiff," and that "the act or conduct [was] sufficiently aggravated to warrant punishment by punitive damages." <u>Strenke</u>, 2005 WI 25, 279 Wis. 2d 52, P38, 694 N.W.2d 296.

<u>Rao v. WMA Sec., Inc.</u>, 2008 WI 73, ¶63 n.56, 310 Wis. 2d 623, 752 N.W.2d 220 (2008). "The law 'requires a plaintiff to show that a defendant acted maliciously toward the plaintiff or intentionally disregarded the rights of the plaintiff, not that a defendant intended to cause harm or injury to the plaintiff.'" <u>D.L. Anderson's Lakeside Leisure Co. v. Anderson</u>, 2008 WI 126, ¶77, 314 Wis. 2d 560, 757 N.W.2d 803 (2008) (quoting <u>Wischer v. Mitsubishi Heavy Indus. Am., Inc.</u>, 2005 WI 26, ¶61, 279 Wis. 2d 4, 694 N.W.2d 320 (2005)).

TEG, Inc. has failed to prove that Phelps acted maliciously or sought to intentionally disregard TEG, Inc.'s rights. The evidence demonstrates that Phelps acted with at least a good faith belief that he had the right to the website and the domain name. He was the one who registered the domain name and he was the one who did nearly all the work in creating the website. As noted above, it was only by resolving novel questions of law was the court able to determine that the domain name did not belong to him. Again, the court does not find the fact that Phelps expressed passion in his belief that he owned the rights to the Third Education Group mark indicative of malice.

TEG, Inc. has failed to demonstrate that Phelps was acting with vengeance against the corporation that he felt had wronged him. Rather, the evidence indicates that Phelps believed he was merely taking what he believed was his. Phelps was wrong, but his error is not synonymous with malice or an intentional disregard of TEG, Inc.'s rights. Accordingly, the court shall deny TEG, Inc.'s request for punitive damages.

### E. Injunctive Relief

TEG, Inc. seeks the following comprehensive injunction:

(1) cease and desist using, in any form, any name incorporating or suggesting (directly or indirectly), the disputed mark.

(2) assign to TEG, Inc. all domain names that incorporate or suggest the mark.

(3) change the name of his Iowa corporation to a name that does not include all the words "Third," "Education," and "Group." This change shall be made or recorded on all appropriate materials, documents or records.

(4) is enjoined from forming, incorporating, registering or operating any entity using in its name all the words "Third" "Education" and "Group."

(5) cease and desist printing or publishing, in any form, material published by TEG, Inc., prior to the date of judgment, except materials written solely by Phelps; provided, Phelps shall not oppose or interfere with publication or use by TEG, Inc. of "The Source of Lake Wobegon," or any material published by TEG, Inc. prior to judgment.

(6) is permanently enjoined from: interfering with TEG, Inc. in any manner; and/or commenting falsely on this dispute, TEG, Inc., or any TEG, Inc. officer/director.

(7) is permanently enjoined from opposing or interfering with registration and use of the mark THIRD EDUCATION GROUP by TEG, Inc.

(8) assist in preparing and publishing corrective advertising as follows:

    (a) A statement drafted by TEG, Inc. shall be signed by Phelps, and shall address, apologize for, correct and/or retract previous objectionable statements appearing in:

        (1) "LetterToMembers6.doc" produced electronically by Phelps; and

        (2) "Apology to Richard Inness" as appearing in emails dated 11/17 & 11/30/08;

    (b) Phelps shall publish the above-described statement, within two weeks of the court's approval, on any website(s) operated or controlled by Phelps, or any entity he controls, and the statement shall remain directly visible and accessible on these web sites for one year after posting. Within two weeks of acquiring control of any additional web site, he shall post the statement on such web site for one year; provided that this requirement shall expire two years after entry of judgment.

    (c) Phelps shall email the statement, with the court's decisions/opinions/orders in these cases, to each addressee of emails from Phelps dated 3/16/06, 9/28/08 and 11/30/08, simultaneously sending an electronic copy to TEG, Inc.

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 23 of 28   Document 138

> (d) The statement, without redaction, may be published or distributed by TEG, Inc.

(Docket No. 130 at 25-26.)

Phelps contends that the injunction that TEG, Inc. seeks is vague, bizarre and provides Phelps with insufficient guidance as to what is prohibited. In addition, Phelps requests that the court order TEG, Inc. to remove Phelps' article ("The Source of Lake Wobegon") from its website.

Under the Lanham Act, courts are authorized "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116.

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392 (2006). The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." Re/Max N. Cent., Inc. v. Cook, 272 F.3d 424, 432 (7th Cir. 2001) (citing cases).

The court shares certain of the concerns raised by Phelps. The requested injunction is overbroad in some respects and vague in others. For example, enjoining Phelps from "interfering" with TEG, Inc. is both vague and broad and might be interpreted as implying that Phelps may not compete with TEG, Inc., something this court certainly does not want to suggest. Further, certain relief sought appears to be moot. For example, a search of the records of the Iowa Secretary of State reveals that Phelps' corporation now has the legal name of "Nonpartisan Education Review, Inc." See http://www.sos.state.ia.us/search/corp/corp_search.asp (last visited November 2, 2009). However, it is incumbent upon the court to craft an injunction narrowly so as to serve the equities at issue.

At the very least, Phelps should be enjoined and restrained from operating under or using, in any facet, the name "Third Education Group," or any name confusingly similar to "Third Education Group." There may be other similar clearly delineated items that might properly be placed in a permanent injunction. Unfortunately, the court is not in a position to enter such an injunction at this time. Therefore, the court will delay the entry of an injunction until after hearing from the parties.

## IV. CONCLUSION

Although family law is outside the purview of federal courts, nonetheless it is the area that is most analogous to the parties' present situation. Meeting through the internet and finding common interests and goals, Phelps and Thompson joined together under a common name and for a common purpose, thus creating an association. They went beyond the preliminary phase of two professionals getting to know each other and just exploring the possibility of a committed relationship. They affirmatively joined together and presented themselves to the world as a single unit. Mindful that Wisconsin is a state that does not recognize common law marriage in the family law context, nonetheless, their association might be analogized to a sort of "commercial common law marriage." It does not have the formality of a legal relationship such as a corporation, but nonetheless, imposes certain legal obligations upon the parties.

When Phelps undertook certain acts, such as registering domain names and applying for a trademark, what he thought he was doing on his own behalf was, in legal reality, for the benefit of the association. When the association chose to formally "tie the knot" and become incorporated, the property acquired during this period of common law association became the property of the corporation. Therefore, when Phelps and Thompson split, Phelps was not entitled to take with him the property of the corporation even though he was primarily responsible for its acquisition.

Accordingly, Phelps breached his fiduciary duty to TEG, Inc., and by creating a competing organization under the same name, he infringed upon TEG, Inc.'s trademark. For these actions,

Case 2:07-cv-01094-AEG   Filed 11/25/09   Page 25 of 28   Document 138

injunctive relief is appropriate. However, TEG, Inc. has failed to demonstrate that it suffered any monetary damages as a result of Phelps' actions. Further, the court finds that under the circumstances of this case, it is inappropriate to award TEG, Inc. punitive damages or to order Phelps to pay TEG, Inc.'s attorneys' fees.

**IT IS THEREFORE ORDERED** that the Clerk shall enter judgment as follows:

**In case number 07-C-1094, regarding TEG, Inc.'s complaint against Phelps:**

- As to TEG, Inc.'s first claim against Phelps for conversion, this claim having been dismissed by the court upon the defendant's motion for summary judgment, judgment shall be entered in favor of Phelps.

- As to TEG, Inc.'s second claim against Phelps for breach of fiduciary duty, the plaintiff having prevailed at a trial before the court, judgment shall be entered in favor of TEG, Inc. and against Phelps. The plaintiff having failed to prove that it suffered damages as a result of the defendant's breach, no damages are awarded.

- As to TEG, Inc.'s third claim against Phelps for estoppel, this claim having been dismissed by the court upon the defendant's motion for summary judgment, judgment shall be entered in favor of Phelps.

- As to TEG, Inc.'s fourth claim against Phelps for negligent misrepresentation, this claim having been dismissed by the court upon the defendant's motion for summary judgment, judgment shall be entered in favor of Phelps.

- As to TEG, Inc.'s fifth claim against Phelps for intentional deceit, the plaintiff having abandoned this claim, it shall be dismissed and judgment shall be entered in favor of Phelps.

- As to TEG, Inc.'s sixth claim against Phelps for "strict responsibility," the plaintiff having abandoned this claim, it shall be dismissed and judgment shall be entered in favor of Phelps.

**In case number 07-C-1095, regarding Phelps' complaint against TEG, Inc. and Thompson**:

- As to all of Phelps' claims against TEG, Inc. and Thompson, these claims having been dismissed by the court upon the defendants' motion for summary judgment, judgment shall be entered in favor of TEG, Inc. and Thompson.

**In case number 07-C-1095, regarding TEG, Inc. and Thompson's counterclaims against Phelps:**

- As to TEG, Inc. and Thompson's first counterclaim against Phelps for infringement of ISSN, the plaintiffs having abandoned this counterclaim, it shall be dismissed and judgment shall be entered in favor of Phelps.

- As to TEG, Inc. and Thompson's second counterclaim against Phelps for infringement of trademark, the plaintiffs having abandoned this counterclaim, it shall be dismissed and judgment shall be entered in favor of Phelps.

- As to TEG, Inc. and Thompson's third counterclaim against Phelps for common law trademark infringement, the plaintiffs having abandoned this counterclaim, it shall be dismissed and judgment shall be entered in favor of Phelps.

- As to TEG, Inc. and Thompson's fourth counterclaim against Phelps for unfair competition under the Lanham Act, the plaintiffs having prevailed at a trial before the court on this counterclaim, judgment shall be entered in favor TEG, Inc. (Thompson not possessing a valid claim under the Lanham Act) and against Phelps. TEG, Inc. having failed to prove that it suffered damages as a result of the defendant's conduct, no damages are awarded.

- As to TEG, Inc. and Thompson's fifth counterclaim against Phelps for common law unfair competition, the plaintiffs having abandoned this counterclaim, it shall be dismissed and judgment shall be entered in favor of Phelps.

- As to TEG, Inc. and Thompson's sixth counterclaim against Phelps for misrepresentation under the DMCA, the defendant having prevailed at a trial before the court, the claim is dismissed and judgment shall be entered in favor of Phelps.

**IT IS FURTHER ORDERED AND ADJUDGED** that TEG, Inc.'s request for attorney's fees under the Lanham Act is **denied**.

**IT IS FURTHER ORDERED AND ADJUDGED** that TEG, Inc.'s requests for punitive damages are **denied**.

**IT IS FURTHER ORDERED** that an in-court conference with counsel for the parties is scheduled for **December 22, 2009** at **10:00 a.m**. The purpose of this conference will be to discuss the contents of a permanent injunction. No later than **December 11, 2009,** counsel for TEG, Inc. shall submit a revised proposed form of permanent injunction, one that is narrowly crafted to meet the equities of this case. No later than **December 17, 2009,** counsel for Phelps may respond to TEG, Inc.'s proposed form of permanent injunction and may submit his own proposed form of permanent injunction.

Dated at Milwaukee, Wisconsin this 25th day of November, 2009.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge